## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WALSH CONSTRUCTION COMPANY II, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 17-2251 (JDB)** |
| **UNITED STATES SURETY COMPANY, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Two parties to a construction bond each claim that the other breached the bond first and thus should be liable for costs and damages. Plaintiff Walsh Construction Company II, LLC ("Walsh") is a general contractor that was hired in 2015 to construct a hotel in the District of Columbia. Defendants United States Surety Company and U.S. Specialty Insurance Company (together, "the Surety") jointly issued a performance bond to one of Walsh's subcontractors, Mid-Atlantic Air, Inc. ("MAA"), which guaranteed completion of the subcontract work.

The underlying controversy arose when Walsh declared MAA to be in default on the subcontract. Initially, the Surety financed the performance of MAA's subcontract work, but after investigating Walsh's declaration of default the Surety denied liability and stopped performing under the bond. Walsh then sued the Surety, and the Surety counterclaimed, alleging that Walsh had breached both the bond and the underlying subcontract. See Answer & Countercl. ("Countercl.") [ECF No. 12]. Walsh now moves to dismiss the counterclaim. See Walsh Constr. Co. II, LLC's Mem. in Supp. of Its Mot. to Dismiss Countercl. ("Walsh's Mot.") [ECF No. 14]. For the following reasons, Walsh's motion will be granted in part and denied in part.

# BACKGROUND[1]

In 2015, a company called Adams Morgan Hotel Owner, LLC (the "Owner") hired Walsh to construct the Adams Morgan Historic Hotel in northwestern Washington, D.C. See Countercl. ¶ 4.[2] Shortly thereafter, MAA subcontracted with Walsh to perform heating, ventilation, air conditioning, and plumbing work on the hotel. See Compl. [ECF No. 2] ¶ 7. In addition to that work, the subcontract required MAA to perform "any and all changes [to its] Work" that Walsh might later order, for which MAA would be paid "an amount equal to the direct cost of labor and materials actually and reasonably used . . . , plus mark up for overhead and profit." See Ex. 2 to Walsh's Mot. ("Subcontract Agreement") [ECF No. 14-3] ¶¶ 4.1–4.2. As a condition of the subcontract, MAA and the Surety executed a performance bond, which guaranteed MAA's performance of the subcontract and named Walsh as an obligee. Countercl. ¶¶ 6–7. MAA and the Surety also entered into a payment bond, which required the Surety to compensate MAA's subcontractors and suppliers in the event of MAA's default. Id. ¶¶ 6, 93.

MAA performed its obligations under the subcontract until April 6, 2017, when MAA notified Walsh in writing that it would not complete any further change-order or overtime work because of several unpaid change-order invoices totaling more than $2 million. See Ex. B. to Countercl. [ECF No. 12].[3] Two weeks later, on April 20, 2017, Walsh declared MAA to be in default of the subcontract and terminated the agreement, alleging that MAA had breached by failing to complete its work on time. See Ex. 4. to Compl. at 2–3.

---

[1] Unless otherwise noted, the facts presented here reflect the allegations of the Surety's counterclaim. Sickle v. Torres Advanced Enter. Sols., LLC, 884 F.3d 338, 345 (D.C. Cir. 2018) (explaining that on a motion to dismiss for failure to state a claim, the non-moving party's factual allegations are accepted as true).

[2] Because the Surety's answer and counterclaims appear in one filing, the paragraph numbers of that filing are non-consecutive. The paragraph numbers cited in this Opinion refer to the counterclaim portion of the filing, see Countercl. at 11–38, not the answer, see id. at 1–11.

[3] The exhibits to Walsh's counterclaim appear in the same filing as the answer and counterclaim. See generally Countercl. at 40–109. Where feasible, the Court will cite the paragraph or page numbers of the exhibits.

After declaring MAA to be in default, Walsh issued a demand to the Surety under the performance bond. See id. at 1. The Surety began investigating Walsh's claim of default, and the Surety later exercised its option to extend its deadline to respond to Walsh's claim by financing performance of the subcontract during the extension period. Countercl. ¶ 44. The Surety financed performance from May 5, 2017 through July 28, 2017 ("the financing period") and retained a replacement subcontractor for MAA during that time. Countercl. ¶¶ 45, 54. During this period, the Surety alleges that it spent more than $6.2 million on the project: over $4 million to finance the subcontract work itself, and an additional $2.2 million to compensate MAA's subcontractors and suppliers for work and materials tendered before Walsh's declaration of default. See Countercl. ¶ 93. On July 28, the Surety completed its investigation, denied liability under the bond, and ceased financing the subcontract work. Countercl. ¶ 92; see Ex. O to Countercl.

Following the Surety's denial of liability, Walsh filed a complaint against the Surety seeking damages for its alleged breach of the performance bond. See Compl. ¶¶ 36–44. The Surety answered Walsh's complaint, see Countercl. at 1–11, and filed a ten-count counterclaim, id. at 11–38. The Surety's counterclaim alleges that if MAA's work was delayed at all, such delays were attributable to design defects and Walsh's poor administration of the project. See Countercl. ¶¶ 28–32; U.S. Surety Co.'s & U.S. Specialty Ins. Co.'s Opp'n to Mot. to Dismiss ("Surety's Opp'n") [ECF No. 16] at 4. The Surety further alleges that Walsh failed to pay MAA on time, so any delays—as well as MAA's ultimate refusal to continue performing change orders and overtime work—were justified. See Countercl. ¶ 35. Additionally, the Surety claims that Walsh intentionally obstructed the Surety's investigation of Walsh's claim by failing timely and accurately to respond to requests for information, see Surety's Opp'n at 6–7 (citing Countercl. ¶¶

47, 55–61, 77), and by failing timely to provide its estimate of the subcontract balance, see id. at 7–8 (citing Countercl. ¶¶ 85–86, 88–89, 92).

The Surety's counterclaim initially asserted ten counts, although the Surety later withdrew two.[4]  Counts One and Four allege that the Surety is entitled to recover more than $4 million that the Surety allegedly spent on the project during the financing period pursuant to Paragraph 8 of the performance bond, which requires Walsh to reimburse the Surety for its "losses, expenses[,] and reasonable attorney's fees" in the event of an unjustified declaration of default.  Countercl. ¶ 101; see id. ¶¶ 94–102, ¶¶ 115–123.  Count One alleges that Walsh's declaration of default was unjustified because Walsh had already materially breached the subcontract by failing to pay MAA, see id. ¶ 97, and Count Four claims that even if MAA had delayed the project, Walsh was estopped from relying on those delays for its declaration of default because it had not objected to them before the preceding week, see id. ¶¶ 119, 121.

Counts Six and Seven also allege that Walsh materially breached the subcontract.  The Surety seeks to recover approximately $2.6 million that Walsh allegedly owes MAA under the subcontract, as well as the $2.2 million that the Surety claims it paid to MAA's subcontractors and suppliers following Walsh's declaration of default.  See id. ¶¶ 130–39, 140–152.  Count Six claims that the Surety is eligible to recover these sums because of an indemnity agreement that assigned to the Surety all of MAA's rights against Walsh under both bonds.  See id. ¶¶ 137–39.  Count Seven claims that the Surety is entitled to recover under the doctrine of equitable subrogation, see id. ¶¶ 147–152, which allows a party to recover in equity when it has "paid the debt of another,"

---

[4] The Surety originally sought declaratory relief in Counts One through Five.  See Countercl. at 26–32.  In response to Walsh's motion to dismiss, however, the Surety conceded that monetary relief alone would "resolve the parties' dispute."  Surety's Opp'n at 10.  Accordingly, the Surety withdrew any reference to declaratory relief, and because Counts Three and Five sought only declaratory relief it withdrew those counts entirely.  See id. at 10–11.

<u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Riggs Nat'l Bank of Wash., D.C.</u>, 646 A.2d 966, 968 (D.C. 1994).

Counts Two, Nine, and Ten allege various other breaches of the performance bond. Specifically, Count Two alleges that Walsh failed to cooperate with the Surety's investigation, <u>see</u> <u>id.</u> ¶¶ 103–108; Count Nine alleges that Walsh repudiated the bond by refusing to disclose its estimate of the subcontract balance, <u>see</u> <u>id.</u> ¶¶ 157–162; and Count Ten alleges several breaches of the covenant of good faith and fair dealing, <u>see</u> <u>id.</u> ¶¶ 163–165. Finally, Count Eight alleges that the Surety is entitled to recover the sums it paid during the financing period under the doctrines of promissory estoppel and unjust enrichment. <u>See</u> <u>id.</u> ¶¶ 153–156.

Walsh has moved to dismiss each count of the Surety's counterclaim on grounds that are explained more fully below. Walsh's motion to dismiss is now fully briefed and ripe for decision.

## <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). Plausibility means that the claim at issue rises "above the speculative level." <u>Twombly</u>, 550 U.S. at 555. The Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." <u>Banneker Ventures, LLC v. Graham</u>, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citing <u>Iqbal</u>, 556 U.S. at 678)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555–556).

# ANALYSIS

## I. Claims Alleging a Breach of Paragraph 8 of the Performance Bond

In Counts One and Four of its counterclaim, the Surety seeks to recover under Paragraph 8 of the performance bond more than $4 million that it spent during the financing period. See Ex. 2 to Compl. ("Bond") [ECF No. 2-2] ¶ 8. That paragraph states: "If it is determined that [Walsh's] declaration of [MAA's] default was not justified under the Subcontract, [Walsh] shall pay Surety an amount equal to Surety's losses, expenses and reasonable attorneys' fees in performing under this Bond." Id. Paragraph 8.1 of the Subcontract Agreement sets forth the specific grounds on which Walsh could declare MAA to be in default, which include MAA's failure "to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work," to "make prompt payment for . . . its workers, subcontractors[,] or suppliers," or to heed "Laws or orders of any public authority having jurisdiction."

To state a claim for breach of contract[5] under District of Columbia law,[6] a pleading must allege that: "(1) a valid contract existed between the parties; (2) the contract created an obligation or duty; (3) the other party breached that duty; and (4) the moving party was damaged as a result of the breach." United States ex rel. Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, P.C., 263 F. Supp. 3d 99, 116 (D.D.C. 2017). Here, the parties do not dispute that the performance bond was a valid contract or that the sums spent by the Surety during the financing period were

---

[5] The Surety styles Counts One and Four as claims for declaratory relief, not for breach of contract. See Countercl. at 26 (asserting a claim for "Declaratory and Monetary Relief Pursuant to 28 U.S.C. § 2201," a provision of the Declaratory Judgment Act); id. at 30 (asserting a claim for "Declaratory Relief Pursuant to 28 U.S.C. § 2201"). As already noted, however, the Surety has withdrawn Counts One and Four to the extent that they seek declaratory relief. See Surety's Opp'n at 10–11. Moreover, both counts allege that Walsh's declaration of default was unjustified, see Countercl. ¶¶ 98–102, 122–123, and both seek damages "pursuant to Paragraph 8 of the Bond." Id. at 27, 31. Therefore, the Court will construe Counts One and Four as asserting claims for breach of Paragraph 8. See Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (noting that a "complaint is construed liberally in the plaintiff['s] favor, and [courts] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged").

[6] D.C. law governs here pursuant to an express provision of the subcontract. See Subcontract ¶ 11.1.

"losses" or "expenses" that the Surety was required to incur under the bond and that Walsh would therefore have to reimburse in the event of an unjustified declaration of default. At this stage of the proceedings, moreover, the Court assumes the truth of the Surety's allegations that its expenses during the financing period totaled more than $4 million. See Countercl. ¶ 93. Hence, the Surety has adequately pleaded the first, second, and fourth elements of its breach-of-contract claims, and all that remains for the Surety to plead is that Walsh breached a duty to reimburse the Surety.

Walsh first raises a threshold argument on the issue of breach that applies to both Count One and Count Four. See Walsh's Mot. at 11. Walsh argues that any recovery under Paragraph 8 is barred by Paragraph 4(e) of the bond, which provides that if the Surety elects to extend its response deadline by financing the subcontract work for a period of time (as the Surety did here), Walsh "shall have no obligation to reimburse Surety or otherwise pay for the work performed until Surety has committed to remedy the default . . . and then only from funds earned under the Subcontract." Here, Walsh argues, the Surety never "committed to remedy [MAA's] default" because it ultimately denied Walsh's claim. Walsh's Mot. at 11. Thus, under Paragraph 4(e), Walsh need not "reimburse Surety or otherwise pay for the work [it] performed" during the financing period. Id. (quoting Bond ¶ 4(e)).

But this reasoning is flawed. Read in context, this sentence of Paragraph 4(e) simply specifies that Walsh need not reimburse the Surety for its expenditures until after the Surety's investigation is concluded; it does not bar the Surety from recovering those sums entirely if the Surety ultimately denies Walsh's claim. Indeed, Walsh's reading would render Paragraph 8 a nullity: Paragraph 8 applies only where Walsh's declaration of default is "not justified," and Walsh does not explain why the Surety would ever "commit[] to remedy" a nonexistent default. Bond ¶ 8; see Hunt Const. Group, Inc. v. Natl. Wrecking Corp., 587 F.3d 1119, 1121 (D.C. Cir. 2009)

("In reading contract provisions we take the contract's entirety into account, seeking to give all its provisions effect."). The Court therefore concludes that the performance bond obligated Walsh to reimburse the Surety in any case where Walsh's declaration of default was unjustified, regardless of whether the Surety committed to remedy the alleged default. And because Walsh does not dispute that it never reimbursed the Surety for the expenses at issue here, whether Walsh breached that obligation depends only on whether its declaration of default was "justified under the Subcontract." Bond ¶ 8.

### A. Count One: The Surety's Claim That Walsh Breached the Subcontract First by Failing to Pay MAA

Count One asserts that Walsh's declaration of MAA's default was unjustified because Walsh's previous failure to pay MAA approximately $2.6 million for subcontract and change-order work had released MAA from its obligations under the subcontract. See Countercl. ¶¶ 23–24, 94–102; Surety's Opp'n at 14. In its motion to dismiss, Walsh does not challenge the sufficiency of the Surety's allegations that it failed to pay MAA; rather, it relies on the subcontract's "pay-when-paid" clause to argue that its duty to pay MAA never matured because it never received payment for MAA's invoices from the Owner. See Walsh's Mot. at 12; Subcontract Agreement ¶ 3.6 (stating, in relevant part, that "if, and only if, Owner pays [Walsh], which is an express condition precedent to [Walsh's] duty to pay [MAA], Progress Payments shall be due to [MAA] no later than fifteen (15) days after receipt of payment from Owner"). The Surety responds by alleging that Walsh wrongfully delayed in seeking payment from the Owner, see Countercl. ¶ 35, and that these delays negated the Owner's payments as a condition precedent to Walsh's duty to pay MAA under the so-called "prevention doctrine." Surety's Opp'n at 14–17.

The prevention doctrine provides that "if a promisor is himself the cause of the failure of . . . a condition upon which his own liability depends, he cannot take advantage of the failure."

8

Aronoff v. Lenkin Co., 618 A.2d 669, 682 (D.C. 1992) (citation omitted); see Restatement (Second) of Contracts § 245 (1981) ("Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused."). It applies where the promisor either "'completely forecloses occurrence of the condition' or 'substantially hinders its occurrence.'" Dist.-Realty Title Ins. Corp. v. Ensmann, 767 F.2d 1018, 1023 (D.C. Cir. 1985) (citation and emphasis omitted). Thus, as one court has explained, "[t]he prevention doctrine does not require proof that the condition would have occurred 'but for' the wrongful conduct of the promisor; instead it only requires that the conduct have 'contributed materially' to the non-occurrence of the condition." Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 725 (4th Cir. 2000) (citation omitted).

Here, the Surety alleges that Walsh "unreasonably and unjustifiably failed . . . to seek payment" from the Owner in a timely fashion. Countercl. ¶ 10. For example, the Surety alleges that while Walsh "approved" one monthly invoice on February 2, 2017—the invoice for work done that January—it did not submit that invoice to the Owner until after April 4. Id. ¶¶ 11–12, 14–15. By Walsh's own admission, the Surety alleges, this delay was abnormal: "[i]n a letter dated August 7, 2017 . . . Walsh admitted[] [that] 'a pay application for January work would, at its best, be funded by the owner and payable to a subcontractor sometime in late February, but more likely payable to the subcontractor in March.'" Id. ¶ 13. The Surety further alleges that Walsh never paid MAA for subcontract work done in January, February, and March 2017, id. ¶ 23, and that as of that April, Walsh had not paid for change-order work from as early as October 2015, id. ¶¶ 18, 20.

Contrary to Walsh's assertions, see Walsh's Mot. at 13–14, these allegations are sufficient to survive Walsh's motion to dismiss. While the counterclaim's conclusory allegation that Walsh

"unreasonably and unjustifiably failed and delayed to seek payment from the Owner," Countercl. ¶ 10, is "not entitled to the assumption of truth," Iqbal, 556 U.S. at 679, the counterclaim buttresses that allegation with a specific example—one of the three unpaid monthly invoices—that "plausibly suggest[s]" that Walsh wrongfully delayed in seeking payment for MAA's invoices from the Owner, id. at 680. Also plausible given allegations is the further inference that Walsh's delay "substantially hinder[ed]" the Owner's payments to Walsh, Ensmann, 767 F.2d at 1023 (citation and emphasis omitted), an express condition precedent to Walsh's duty to pay MAA.

Hence, assuming the Surety's factual allegations to be true—as the Court must at this stage, see Sickle, 884 F.3d at 345—the Surety has stated a claim that Walsh's delay negated the Owner's payments to Walsh as a condition precedent to Walsh's duty to pay MAA. See Ne. Drilling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 40 (1st Cir. 2001) (subcontractor's delay in submitting invoices to general contractor negated general contractor's payment as a condition precedent to subcontractor's duty to pay a sub-subcontractor); Moore Bros., 207 F.3d at 725 (general contractor's wrongful conduct in preventing owner from obtaining financing precluded application of "pay when paid" clause). And because Walsh does not dispute that its failure to fulfill that duty would release MAA from its obligation to perform the subcontract work, see Ashcraft & Gerel v. Coady, 244 F.3d 948, 950 (D.C. Cir. 2001) (noting that "a party's continuing obligations under a contract are conditioned on there being no 'uncured material failure by the other party to render [a required] performance due at an earlier time'" (quoting Restatement (Second) of Contracts § 237)); accord 3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC, 922 A.2d 439, 445 (D.C. 2007), the Surety has plausibly alleged that Walsh's declaration of default on the basis of those delays was unjustified. Count One therefore survives Walsh's motion to dismiss.

**B.     Count Four: The Surety's Alternative Claim that Walsh Breached the Subcontract Even if MAA's Delays Were Unjustified**

Count Four alleges that even if MAA were responsible for delaying the project, its delays still could not justify Walsh's declaration of default because Walsh did not object to them until a week before it issued its declaration. <u>See</u> Surety's Opp'n at 19–20; Countercl. ¶¶ 115–123. Walsh responds that this claim is barred by two contractual provisions: an anti-waiver clause in the subcontract and a provision of the performance bond whereby the Surety waived its right to object to any changes in the schedule of the subcontract work. <u>See</u> Walsh's Mot. at 16–17.

Paragraph 2 of the performance bond states, in relevant part: "The Surety agrees that no . . . extension of time . . . or other modification of the terms of . . . the . . . Subcontract [between Walsh and MAA] . . . , or in the . . . work to be performed [thereunder], . . . or in the plans shall in any[] [way] affect its obligations [under] this Bond." Bond ¶ 2. According to Walsh, this provision shows that the Surety "waived any right to object to scheduling changes." Walsh's Mot. at 16. But as the Surety explains, Count Four does not allege "that Walsh extended MAA's time to perform or otherwise changed any of the terms of MAA's Subcontract"; indeed, according to the Surety, "it does not appear that Walsh ever formally extended MAA's time of performance or otherwise modified its Subcontract as it relates to the time of completion." Surety's Opp'n at 20. Hence, because the Surety's counterclaim does not allege any modification of the subcontract— either as to the timing of the subcontract work or otherwise—Paragraph 2 of the performance bond is inapposite.

Next, Walsh relies on Paragraph 13.2 of the subcontract, which states: "The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Agreement, or exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition, or right as respects further

performance." Walsh's Mot. at 17 (citation omitted). According to Walsh, this provision means that Walsh could not have waived its right to insist on timely performance on April 20 even if, as the Surety alleges, it had not asserted that right prior to April 13. For its part, the Surety does not meaningfully dispute that Paragraph 13.2 "permits Walsh to enforce a previously waived obligation as it relates to <u>future</u> performance." Surety's Opp'n at 21; <u>see</u> <u>Nat'l R.R. Passenger</u> <u>Corp. v. Expresstrak, LLC</u>, No. 02-1773, 2006 WL 2947555, at *10 (D.D.C. Oct. 16, 2006) ("Several jurisdictions have . . . enforced anti-waiver provisions . . . ."). But, the Surety argues, Paragraph 13.2 does not say that Walsh may "waive MAA's <u>past</u> non-compliance with schedule deadlines[] <u>and then use that non-compliance as a basis for declaring a default</u>." Surety's Opp'n at 21.

The Surety's reading of Paragraph 13.2 is correct. Although Paragraph 13.2 plainly authorized Walsh to insist on future performances that it had not previously demanded, nothing in that provision speaks to whether or when Walsh may rely on past instances of nonperformance to terminate the subcontract. But it does not necessarily follow from this conclusion that Walsh's declaration of default was improper. Rather, a different provision of the subcontract governs when Walsh may declare MAA to be in default. Paragraph 8.1 states: "If [Walsh] determines at its sole discretion that [MAA] has . . . . refused or failed to . . . maintain the Schedule of Work . . . [MAA] shall be in default of this [subcontract]." Subcontract Agreement ¶ 8.1. Then, if MAA "fails within seventy-two (72) hours after receipt of written notice [of its default] . . . to commence and continue satisfactory correction of such default . . . , [MAA] shall have materially breached the [subcontract]," <u>id.</u>, and Walsh "may . . . terminate [the subcontract] or a[ny] portion thereof," <u>id.</u> ¶ 8.2.

So long as the Court assumes—as it must as to Count Four—that MAA delayed the project, see Countercl. ¶ 116, the Surety has failed to plead that Walsh's declaration of default and subsequent termination of the subcontract were improper. Paragraph 8.1 expressly identifies MAA's failure to "maintain the Schedule of Work" as a ground for declaring MAA to be in default, Subcontract Agreement ¶ 8.1, and Count Four does not allege that MAA made any attempt to cure its defective performance during the seventy-two-hour grace period following Walsh's declaration. Thus, pursuant to Paragraph 8.2 of the subcontract, Walsh's termination of the contract was proper. And although the Surety claims that Walsh was estopped from relying on MAA's delays because Walsh issued its declaration of default a mere seven days after it first raised those delays with MAA, see Countercl. ¶¶ 119–121, it cites no legal authority for this theory of estoppel.[7] Hence, the Court concludes that the Surety has failed in Count Four plausibly to allege that Walsh's declaration of default was unjustified even if MAA had wrongfully delayed the project. Thus, Count Four has not adequately pleaded that Walsh breached a duty owed to the Surety under Paragraph 8, and Walsh's motion to dismiss Count Four will be granted.

## II. Claims Alleging a Breach of the Subcontract on MAA's Behalf

In Counts Six and Seven, the Surety seeks to recover the $2.6 million that Walsh allegedly owes MAA under the subcontract, as well as the $2.2 million that the Surety allegedly paid to MAA's subcontractors and suppliers under the payment bond.[8] These two counts both repeat the

---

[7] Instead, the Surety's opposition focuses on its primary allegations that "MAA did not materially delay the Project[] and that Walsh began blaming MAA for delays only after MAA complained of Walsh's failure to process months-old [payment] requests." Surety's Opp'n at 20 (citations omitted). But Count Four clearly states that "[t]his Count is pled in the alternative in the event it is determined at trial that MAA delayed the Project," Countercl. ¶ 116, and the Surety "may not amend its [counterclaim] through briefs in opposition to a motion to dismiss," Tatneft v. Ukraine, 301 F. Supp. 3d 175, 190 (D.D.C. 2018). The Surety's reliance on these allegations is therefore misplaced.

[8] Counts Six and Seven also seek damages for the Surety's "'losses, expenses[,] and reasonable attorneys' fees' pursuant to Paragraph 8 of the Bond." Id. at 33, 35. But as Walsh points out, financing the project during the financing period was "a primary obligation of the Surety which may allow the Surety to assert a [direct] claim under the Performance Bond" but not a derivative claim on MAA's behalf. Walsh's Mot. at 21; see Bond ¶ 8 (stating that,

13

Surety's allegations that Walsh breached the subcontract by failing to pay MAA. See id. ¶¶ 131–34, 141–44. Because the Court has already concluded in its discussion of Count One that the Surety has plausibly alleged this breach, the only question remaining is whether Counts Six and Seven permit the Surety to recover on MAA's behalf.[9] As explained below, they do.

## A. Count Six: Assignment

Count Six argues that MAA assigned to the Surety "all claims, demands, and causes of action relating to the subcontract [and the payment bond]" in an indemnity agreement. Countercl. ¶ 137; see id. ¶ 139 ("The Surety, as assignee of MAA, is entitled to recover . . . reimbursement for all amounts paid by the Surety in connection with the Subcontract[] . . . [and] the Payment Bond . . . ."); Ex. P to Countercl. ("Indemnity Agreement") ¶¶ I.A, II (indemnifying the Surety on "any Bond" between the Surety and MAA). According to Walsh, this assignment violated Section 7.1 of the subcontract, which states that MAA "shall not assign this Agreement or its proceeds or subcontract the whole or any part of [MAA's] Work without [Walsh's] prior approval." See Walsh's Mot. at 20 (quoting Subcontract Agreement ¶ 7.1). The Surety responds that Paragraph 7.1 only "reserves to [Walsh] the right . . . to decline the services of a party . . . who may not appear qualified to satisfactorily perform the Subcontract Work" and does not "preclude an assignment of a cause of action for breach of the Subcontract." Surety's Opp'n at 23. The Surety is correct.

---

in the event of an unjustified declaration of default, Walsh "shall pay Surety an amount equal to Surety's losses, expenses and reasonable attorneys' fees" and making no mention of MAA (emphasis added)). Hence, to the extent that Counts Six and Seven seek damages under Paragraph 8, they will be dismissed.

[9] Again, Walsh raises a threshold argument: that the Surety lacks Article III standing to bring claims on behalf of MAA because the Surety "can only assert his own right and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" Walsh's Mot. at 19 (citing Warth v. Seldin, 422 U.S. 490, 499 (1975)). But the Supreme Court has explicitly recognized that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor" and that the same is true of "subrogees, who have been described as 'equitable assignees.'" Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 773–74 (2000) (citation and alteration omitted)). Walsh's motion to dismiss Counts Six and Seven for lack of standing will therefore be denied.

14

"District of Columbia law evinces a policy of free assignability of claims." <u>Lannan Found.</u> <u>v. Gingold</u>, 300 F. Supp. 3d 1, 32 (D.D.C. 2017) (quoting <u>Antal's Rest., Inc. v. Lumbermen's Mut.</u> <u>Cas. Co.</u>, 680 A.2d 1386, 1388 (D.C. 1996)).  In general, "all contractual rights may be assigned, including the right to sue for enforcement of a claim," although a District of Columbia court will honor an anti-assignment clause "when it contains clear, unambiguous language." <u>Antal's Rest.</u>, 680 A.2d at 1388 (D.C. 1996) (quoting <u>Flack v. Laster</u>, 417 A.2d 393, 399 (D.C. 1980)).  By contrast, where an anti-assignment clause "is ambiguous, its language should be read in the light of all the surrounding facts and circumstances, including the conduct of the parties." <u>Am. Bldg.</u> <u>Maint. Co. v. L'Enfant Plaza Props., Inc.</u>, 655 A.2d 858, 861 (D.C. 1995).  Here, the latter rule applies: because Paragraph 7.1 does not clearly state whether it applies to the assignment of a cause of action for breach of the subcontract, the Court must look to the surrounding facts and circumstances "to ascertain what a reasonable person in the position of the parties would have thought the words meant." <u>Potomac Elec. Power Co. v. Mirant Corp.</u>, 251 F. Supp. 2d 144, 150 (D.D.C. 2003) (citing <u>Christacos v. Blackie's House of Beef, Inc.</u>, 583 A.2d 191, 194 (D.C. 1990)).

Although the Court is unaware of any District of Columbia authorities addressing this precise issue, <u>Handex of Maryland, Inc. v. Waste Management Disposal Services of Maryland</u>, 458 F. Supp. 2d 266 (D. Md. 2006), is instructive.  There, a contractor and a property owner had entered into a surety agreement, and the surety company later asserted claims against the owner on the contractor's behalf. <u>Id.</u> at 269.  As framed by the court, the question was whether, under Maryland law,[10] an anti-assignment clause in the underlying contract "trump[ed]" an anti-

_____

[10] Because "D.C. imported the common law of Maryland as of 1801," District of Columbia courts "have 'customarily[] looked to post-1801 decisions of the Court of Appeals of Maryland for assistance in interpreting the law.'" <u>See</u> <u>Hensel Phelps Constr. Co. v. Cooper Carry Inc.</u>, 861 F.3d 267, 272 (D.C. Cir. 2017) (alterations in original) (quoting <u>Heard v. United States</u>, 686 A.2d 1026, 1029 (D.C. 1996)).

assignment clause in an indemnity agreement between the contractor and the surety. Id. at 271.

The court first noted that although it would ordinarily apply the "unambiguous, plain language of

the anti-assignment clause," that language was "in direct conflict with the equally unambiguous,

plain language of the Indemnity Agreement's assignment . . . clause[]." Id. Thus, the court

proceeded to consider "the two contracts . . . from the standpoint of what a reasonable person in

the position of the parties would have meant at the time the agreements were signed." Id.

Applying this framework, the court first observed that "as a matter of routine practice and

tradition in the construction industry, corporate sureties do not issue bonds making themselves

liable for a contractor without indemnity agreements in place." Id. Given that the parties to the

contract at issue were all sophisticated participants in that industry, the court concluded that they

were likely "keenly aware of [this] routine practice" and hence "would understand [a]

nonassignment clause to be inapplicable to . . . [the] surety [company]." Id. at 273. For that

reason, and because the owner was subjectively aware of the surety agreement "from the very

beginning," the court concluded that the anti-assignment clause was intended not to prohibit the

contractor from assigning its claims to the surety, but rather "to prevent a stranger to the transaction

from taking over the rights or duties of the Contractor without the Owner's approval." Id. The

Handex court therefore allowed the surety company's derivative claims to proceed. Id. at 274.

Though not binding on this Court, Handex's reasoning is persuasive here. As in Handex,

it appears that the parties here intended the anti-assignment clause to prohibit MAA from assigning

funds or subcontract work to another subcontractor or material supplier without Walsh's approval,

not to prohibit an assignment of MAA's cause of action for breach of the subcontract. See

Subcontract Agreement ¶ 7.1 (providing that MAA "shall not assign this Agreement or its proceeds

[]or subcontract the whole or any part of [MAA']s Work without [Walsh's] prior approval"

(emphasis added)).  And like the owner in <u>Handex</u>, Walsh is a sophisticated party in the industry, <u>see</u> Compl. ¶ 1, and therefore should have been "keenly aware" of the likelihood that MAA would assign its rights against Walsh to the Surety in a separate indemnity agreement.  Hence, this Court concludes that the subcontract's anti-assignment clause does not invalidate MAA's assignment of its rights against Walsh to the Surety.  Walsh's motion to dismiss Count Six will therefore be denied.

## B.      Count Seven: Equitable Subrogation

In Count Seven, the Surety contends that it can recover on MAA's behalf under the doctrine of equitable subrogation, <u>see</u> Countercl. ¶¶ 140–152, which provides that "where one party has paid the debt of another, justice requires that the payor be able to recover his loss from the one who should have paid it, to prevent unjust enrichment," <u>Nat'l Union Fire Ins.</u>, 646 A.2d at 968 (citation omitted).  Because the Court concludes that MAA has validly assigned its rights against Walsh to the Surety through the indemnity agreement, the Court will address this alternative theory only briefly.  <u>See</u> <u>Handex</u>, 458 F. Supp. 2d at 274.

The Surety argues that it is subrogated to MAA in two respects.  First, the Surety asserts that it is equitably subrogated to MAA's rights "relating to Walsh's breaches of the Subcontract." Countercl. at 35.  Walsh's motion does not address this contention, <u>see</u> Walsh's Mot. at 21–22, and at least one other court has held that where, as here, a contractor is a "frequent player in the construction industry" and hence should be "cognizant of the fact that the surety relationship includes a conditional assignment of the [sub]contractor's rights to the surety,"  it would "fl[y] in the face of equity" to allow the contractor to pursue its claims against the surety while blocking the surety from asserting the subcontractor's claims against the contractor.  <u>Handex</u>, 458 F. Supp. 2d at 275.  Thus, although the Surety has not "paid the debt of another" in a literal sense—since

the $2.6 million that Walsh allegedly owes MAA has not changed hands—the Surety is nonetheless subrogated to MAA's rights against Walsh for Walsh's alleged breaches of the subcontract. See id. ("Subrogation is an equitable remedy. It allows the Court to do that which ought to be done.").

Second, the Surety claims that it can recover approximately $2.2 million that it paid to MAA's subcontractors and suppliers under the payment bond. See Surety's Opp'n at 26–27. Walsh responds that it "had no duty to pay MAA's subcontractors," so the Surety did not pay "the debt of [Walsh]" when it made payments under that bond. Walsh's Mot. at 21. While it is true that the subcontract contemplated that MAA would be responsible for paying its own subcontractors and suppliers, the subcontract also contemplated that the funds used to make those payments would be drawn from Walsh's payments to MAA. See Subcontract Agreement ¶ 3.9 ("All payments received by [MAA] shall first be used to satisfy any indebtedness owed by [MAA] to persons or other entities furnishing labor or materials for use in performing or incorporation into [MAA's] Work."); id. ¶ 3.11 (authorizing Walsh to send MAA's payments to its subcontractors and suppliers directly if Walsh had reason to believe that MAA was not keeping up with its payments to those third parties). And the Surety alleges that when Walsh stopped making payments to MAA, it began paying MAA's subcontractors and suppliers on MAA's behalf. If true, this allegation would be sufficient to permit the Surety to recover those funds from Walsh in equitable subrogation. See U.S. Fidelity & Guar. Co. v. United States, 475 F.2d 1377, 1382 (Ct. Cl. 1973) (en banc) (explaining that a surety is "entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the [sub]contractor whose debts it paid" (second emphasis added) (citing Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962)); accord Handex, 458 F. Supp. 2d at 275. Walsh's motion to dismiss Count Seven will therefore be denied.

### III.     Claims Alleging Other Breaches of the Performance Bond

Counts Two, Nine, and Ten assert that Walsh breached the performance bond in various ways and seek damages as a result of each breach. The Court will address each claim in turn.

### A.  Count Two: Failure to Cooperate with the Investigation

In Count Two, the Surety claims that Walsh "materially breached the Performance Bond by failing to cooperate with the Surety's investigation," thereby excusing the Surety from any obligations under the bond. Countercl. ¶¶ 107–08. Walsh responds that it had no duty to cooperate in the investigation because the Surety was obligated to make "an independent investigation of the facts and circumstances of the alleged default." Walsh's Mot. at 14–15. "Additionally," Walsh argues, "even if Walsh breached some unwritten duty to cooperate in the investigation, the Surety fails to assert how it has been damaged by that breach." Walsh's Reply to Surety's Opp'n ("Walsh's Reply") [ECF No. 17] at 7.

Count Two will be dismissed because, as Walsh correctly points out, that count no longer seeks any relief. See Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought . . . ."). Aside from attorney's fees and costs, Count Two initially sought only declaratory relief: specifically, a declaration that Walsh breached the performance bond. Countercl. at 28–29. In its opposition brief, however, the Surety "consent[ed] to withdraw from Counts 1 through 5 any reference to the Declaratory Judgment Act, 28 U.S.C. § 2201(a)," explaining "that the remaining portions of the Surety's Counterclaim not specifically seeking a declaratory order will be sufficient to resolve the parties' dispute." Surety's Opp'n at 10–11. And although the Surety purportedly "d[id] not withdraw its prayer for monetary relief pursuant to Paragraph 8 of the Bond" as stated in "Counts 1, 2, and 4 of the Counterclaim," id. at

11, Count 2 in fact contains no such prayer, see Countercl. at 28–29.[11]  Therefore, Count Two fails

to seek any relief, and Walsh's motion to dismiss it will be granted.

### B.    Count Nine: Repudiation of the Performance Bond

In Count Nine, the Surety seeks damages for Walsh's alleged repudiation of the

performance bond.  Countercl. ¶ 161; Surety's Opp'n at 29.  In a June 21, 2017 letter to Walsh,

the Surety sought reasonable assurances that, if it were to accept liability under the bond and either

complete the subcontract work itself or hire a replacement subcontractor, Walsh would "pay the

balance of the Subcontract Price to the Surety or its completion contractor," as the performance

bond required.  Countercl. ¶ 85.  The Surety had a reasonable apprehension that Walsh would

refuse to do so, the letter explained, because Walsh had not yet provided its "calculation of the

balance of the Subcontract Price" to the Surety and otherwise had failed to respond to the Surety's

requests for information.  Id.  Walsh points out that the Surety never exercised the option to

complete the subcontract work, and that in any case Walsh did eventually report the balance of the

subcontract price (which, in Walsh's view, was negative) on July 26, 2017.  Walsh's Reply at 12–

13.

Before a party has the right to recover for a repudiation of a contract, "the repudiating party

must have communicated, by word or conduct, unequivocally and positively its intention not to

perform."  EastBanc, Inc. v. Georgetown Park Assocs. II, L.P., 940 A.2d 996, 1005 (D.C. 2008)

(quoting Order of AHEPA v. Travel Consultants, Inc., 367 A.2d 119, 125 (D.C. 1976)).  The

Surety alleges that, when asked to disclose the balance of the subcontract price, Walsh refused to

pay the Surety "any amount whatsoever."  Surety's Opp'n at 31.  While it is true that Walsh told

---

[11] Even if it did, the Surety does not explain how Walsh's alleged breach of Paragraph 4 of the bond—the provision that authorizes the Surety to investigate Walsh's claims—would support the Surety's claim to relief under Paragraph 8, which entitles the Surety to its "losses" and "expenses" only if "it is determined that [Walsh's] declaration of [MAA's] default was not justified under the Subcontract."  Bond ¶ 8 (emphasis added).

the Surety that it "[did] not anticipate releasing any funds to the [Surety]," Ex. N to Countercl. at 2, that statement does not amount to an "unequivocal and positive" repudiation of the performance bond. Rather, it simply reflected Walsh's view that, as a result of MAA's alleged delays, MAA actually owed Walsh money under the subcontract, and not the other way around. Although the Surety may disagree with Walsh's calculation of the subcontract balance—or even allege, as it does elsewhere in its counterclaim, that the calculation was made in bad faith, see Countercl. ¶ 164—the Surety's allegations do not plausibly suggest that Walsh unequivocally communicated an intention to repudiate the performance bond. See EastBanc, Inc., 940 A.2d at 1005. Walsh's motion to dismiss will therefore be granted as to Count Nine.

### C.     Count Ten: The Covenant of Good Faith and Fair Dealing

The Surety claims that Walsh "breached the covenant of good faith and fair dealing … by: (a) refusing to pay the Surety the balance of the Subcontract price; (b) hindering the Surety's investigation of the alleged default; and/or (c) willfully overstating its alleged damages and setoffs." Countercl. ¶ 164. Walsh responds that the Surety never triggered Walsh's obligation to pay the balance of the subcontract price by electing to complete the subcontract work under Paragraph 4 (as already discussed as to Counts One and Four), that Walsh had no duty to assist the Surety with its independent investigation (as already discussed as to Count Two), and that the Surety's claim of overstated damages and setoffs is meritless. See Walsh's Mot. at 26.

Every contract contains an implied covenant of good faith and fair dealing. Window Specialists, Inc. v. Forney Enters., Inc., 106 F. Supp. 3d 64, 89 (D.D.C. 2015) (citing Choharis v. State Farm Fire & Cas. Co., 961 A.3d 1080, 1087 (D.C. 2008)). To plead a breach of this covenant, a plaintiff must allege that "(1) the defendant has taken steps, or refused to take steps, (2) which destroyed or injured the plaintiff's right to receive the fruits of the contract." Magee v. Am. Inst.

of Certified Pub. Accountants, 245 F. Supp. 3d 106, 112 (D.D.C. 2017). "There is no single definition of good faith and fair dealing," but "[g]ood faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" Window Specialists, 106 F. Supp. 3d at 89 (quoting Restatement (Second) Contracts § 205 cmt. a (Am. Law Inst. 1981)).

The Surety's allegations in Count Ten are insufficient to suggest plausibly a breach of the covenant of good faith and fair dealing. As to part (a), the Surety does not allege that Walsh withheld the balance of the subcontract price for any improper purpose. On the contrary, the documents attached to the Surety's own counterclaim suggest that Walsh withheld those funds based on a good-faith belief that Walsh was owed money on the subcontract. See Ex. N to Countercl. (letter from Walsh to the Surety stating that Walsh was withholding payment based on "damages and set-offs" that rendered the contract balance negative). And although the Surety's contention that Walsh inflated its "damages and setoffs" could in theory support a good-faith-and-fair-dealing claim, the only fact alleged in support of this contention is that Walsh failed to provide the Surety with any supporting documentation concerning its alleged damages. Countercl. ¶ 89. Even accepting this allegation as true, Walsh's mere failure to provide supporting documentation does not plausibly suggest that its estimation of the subcontract balance was intentionally inflated. Part (c) of Count Ten therefore fails as well.

The Surety's allegation in part (b) of Count 10 that Walsh "hinder[ed] the Surety's investigation of the alleged default"—which essentially reprises the Surety's allegations in Count Two—also fails because it does not plausibly allege that Walsh's delays "destroyed or injured [the Surety's] right to receive the fruits of the contract." Magee, 245 F. Supp. 3d at 112. Although the Surety's counterclaim is littered with allegations that Walsh failed to respond to the Surety's

requests for information during the financing period, <u>see, e.g.</u>, Countercl. ¶¶ 47, 53, the Surety does not explain how those delays led it to suffer "damages . . . in an amount estimated to exceed $4 million," <u>id.</u> at 38.  Moreover, even if Count Ten were liberally construed to allege that Walsh's delays prolonged the financing period and thereby increased the Surety's expenditures on the project, <u>see</u> Countercl. ¶ 57 (alleging that "Walsh's failure to cooperate with the Surety's informational requests delayed the Surety from concluding its investigation"), those losses would seemingly be recoverable under the performance bond—regardless of whether Walsh's declaration of default was justified.  If it were unjustified, the performance bond would entitle the Surety to "an amount equal to [its] losses[] [and] expenses . . . in performing under this Bond." <u>See</u> Bond ¶ 8.  If it were justified, the Surety could offset its financing-period expenses against the bond's "penal sum"—that is, the approximately $ 8.4 million that the bond would require the Surety to pay Walsh in the event of MAA's default. <u>See id.</u> ¶ 4(e).  In either case, therefore, it appears that the performance bond would permit the Surety to recover all its financing-period expenses— including expenses incurred due to Walsh's allegedly bad-faith delays—so the Surety has failed to plead that the alleged delays interfered with the Surety's ability to enjoy the fruits of the bond. Hence, this final part of Count Ten will be dismissed as well.

### IV.    Claims for Promissory Estoppel and Unjust Enrichment

In Count Eight, the Surety seeks to recover more than $4 million that it allegedly spent during the financing period under theories of unjust enrichment and promissory estoppel.  <u>See</u> Surety's Opp'n at 27.  Walsh responds that the performance bond, as an express contract governing the parties' conduct, displaces both claims.  <u>See</u> Walsh's Mot. at 22.

"Because both promissory estoppel and unjust enrichment presuppose that an express, enforceable contract is absent, District of Columbia courts generally prohibit litigants from

asserting these claims when there is an express contract that governs the parties' conduct." <u>Plesha</u> <u>v. Ferguson</u>, 725 F. Supp. 2d 106, 112 (D.D.C. 2010) (citing <u>Vila v. Inter-Am. Inv. Corp.</u>, 570 F.3d 274, 279 (D.C. Cir. 2009)). Here, the performance bond—an express contract—governs the parties' actions during the financing period regardless of whether Walsh's declaration of default was justified or unjustified. As noted above with respect to Count Ten, if the declaration of default was justified, the Surety's work during the financing period would reduce the bond's penal sum. Bond ¶ 4(e). If it was unjustified, then Walsh would owe the Surety its losses and expenses incurred during the financing period. <u>See id.</u> ¶ 8. The extracontractual theories of promissory estoppel and unjust enrichment would be unavailable in either case.[12]

The Surety's unjust enrichment and promissory estoppel claims for work "beyond the scope of the subcontract" also fail because the subcontract expressly contemplates that Walsh might order MAA to perform additional work. <u>See</u> Subcontract Agreement ¶¶ 4.1, 4.2. The Surety argues that certain work it financed in July 2017 may have fallen outside the "general scope of the [subcontract]," Subcontract Agreement ¶ 4.1, and therefore may be recoverable in unjust enrichment or promissory estoppel. Countercl. ¶¶ 67–76. But the Surety does not allege <u>why</u> it believes the extra work to have been beyond the scope of the subcontract; rather, it asserts that "it is simply too soon to determine whether … [e]xtra Work that Walsh directed the Surety to perform,

---

[12] "[T]he District of Columbia Court of Appeals has recognized that, in the narrow circumstance '[w]hen an express contract has been repudiated or materially breached by the defendant, restitution for the value of the non-breaching party's performance is available as an alternative to an action for damages on the contract.'" <u>Am. Civ.</u> <u>Constr.</u>, 263 F. Supp. 3d at 116 (quoting <u>Lee v. Foote</u>, 481 A.2d 484, 485 (D.C. 1984) (per curiam)). This narrow exception is inapplicable here. Count Nine of the Surety's counterclaim alleges that Walsh repudiated the performance bond, but that count will be dismissed for the reasons stated above. Similarly, although Counts Two and Ten expressly allege that Walsh breached the performance bond, and although the Court has construed Counts One and Four as also alleging breaches of the bond, Counts Two, Four, and Ten fail for the reasons described above, and Count One does not assert that Walsh's breach of the bond was "material." <u>Id.</u> (citation omitted); <u>see</u> <u>Ashcraft & Gerel</u>, 244 F.3d at 950 (noting that a party is relieved from its obligations under a contract only by an "uncured <u>material</u> failure by the other party" (emphasis added) (citation omitted)). The Surety therefore cannot seek restitution as an alternative remedy.

must be regarded as within the scope of the parties' written agreements." Surety's Opp'n at 28. At the motion-to-dismiss stage, however, it is the pleader's responsibility to allege facts that, when assumed to be true, "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555. Because the Surety has not carried this burden here, Walsh's motion to dismiss Count Eight will be granted.

## CONCLUSION

For the foregoing reasons, Walsh's motion to dismiss the counterclaim will be denied as to the Surety's claim that Walsh breached the performance bond by failing to reimburse the Surety for its outlays during the financing period (Count One) and its claim that Walsh breached the underlying subcontract with MAA, both as MAA's assignee (Count Six) and subrogee (Count Seven).[13] The motion will be granted as to the Surety's claim for a declaration that Walsh breached the performance bond by failing to cooperate with the Surety's investigation of its claim (Count Two); the other two counts that seek only declaratory relief, which the Surety has expressly withdrawn (Counts Three and Five); the Surety's claim, pleaded in the alternative, that Walsh breached the performance bond even if MAA had wrongfully delayed the project (Count Four); the Surety's promissory estoppel and unjust enrichment claims (Count Eight); the Surety's claim that Walsh repudiated the performance bond (Count Nine); and the Surety's claim that Walsh breached the covenant of good faith and fair dealing (Count Ten). A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

---

[13] As explained above, however, Counts Six and Seven will be dismissed to the extent that they seek to recover under Paragraph 8 of the performance bond.

Dated: September 25, 2018